**TAYLOR & GOMEZ, LLP**
Benjamin Taylor, SBN: 023868
2600 North 44th Street, Suite B-101
Phoenix, Arizona 85008
Phone: 602-394-8930 Fax: 602-957-3257
E-mail: bt@taylorgomezlaw.com

**BIHN & McDANIEL, P.L.C.**
2600 N. Central Ave, Suite 1775
Phoenix, Arizona 85004
(602) 248 9779
Martin A. Bihn (014338) mbihn@phxlegal.com

**Law Office Of Michael S. Eskander, P.L.C.**
Michael S. Eskander, J.D., L.L.M.
(480) 491-4400
1921 South Alma School Suite 310
Mesa, Arizona 85210
Michael@eskanderlaw.com

**SHAHEEN & GORDON, P.A.**
Olivia Bensinger (NH Bar #274145)
Leah Cole Durst (NH Bar #273679)
107 Storrs Street/P.O. Box 2703
Concord, NH 03302 (603) 225-7262
ldurst@shaheengordon.com
obensinger@shaheengordon.com
Co-Counsel for Plaintiffs

**UNITED STATES DISCTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Joseph Yacoub and Michael Yacoub;<br><br>Plaintiffs,<br>vs.<br><br>Mayo Clinic, a foreign non-profit corporation d/b/a Mayo Clinic Alix School of Medicine;<br><br>Defendant. | **No. 24-CV-01298-SMM**<br><br>**SECOND AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiffs for their complaint against Defendant allege as follows:

**INTRODUCTION**

1. This case is about a powerful medical school using its resources to destroy the medical careers of two minority students because they raised concerns about the grading in a course. The medical school violated its own policies in repeatedly failing to investigate students' concerns about discrimination. Instead of investigating, the medical school took reprisal against the students by denying accommodation requests and by falsely accusing them of academic deficiencies, failing to meet deadlines, and stealing hospital badges. The students filed discrimination and retaliation complaints with the Department of Education's Office of Civil Rights ("OCR"). The medical school responded by altering the students' clerkship application documents, disabling the record keeping functions in the students' computer accounts, and discussing a plan to expel the students after resolving the OCR complaints.

Days before the residency application deadline, the medical school pulled the students' residency applications from the nationwide application system. The students discovered and reported the interference. Hours before the deadline for submission, the medical school offered to upload corrected documents only if students agreed to a settlement of their OCR complaints and released all claims against the medical school.

When the medical school's extortion plan failed, it changed its own policies to reupload new and damaging materials to the students' accounts in the residency application system. The students had 12 interviews each but were not matched with a residency

program. The medical school successfully destroyed the students' medical careers because they had the temerity to question a grade.

**PARTIES**

2. Plaintiff Joseph Yacoub ("Joseph") is a resident of Maricopa County, Arizona.

3. Plaintiff Michael Yacoub ("Michael") is a resident of Maricopa County, Arizona.

4. Defendant Mayo Clinic d/b/a Mayo Clinic Alix School of Medicine is a Minnesota non-profit corporation duly authorized and conducting business in Maricopa County, Arizona.

**JURISDICTION AND VENUE**

5. This Court has subject matter jurisdiction pursuant 28 U.S.C 1331 over plaintiffs' federal claims and jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367(a).

6. Venue is proper as events giving rise to this action occurred in Maricopa County, Arizona.

**FACTUAL BACKGROUND**

7. Defendant Mayo Clinic Alix School of Medicine ("MCASOM") is widely understood to be a top tier medical school.

8. MCASOM operates three medical school campuses located in Arizona, Minnesota, and Florida.

9. MCASOM has formulated policies governing students and faculty which are contractual in nature.

10. MCASOM enrolls only highly motivated and exceptional students into its medical school program.

11. MCASOM accepted Joseph and Michael into its Arizona medical school program in 2020.

12. They were among very few minority students admitted in recent years to MCASOM's Arizona program.

13. Joseph and Michael were successful in their first two academic years at MCASOM.

14. In the third year of MCASOM's program, the focus shifted to a series of weeks long clerkship rotations in various medical specialties in the hospital.

15. Students generally followed resident physicians through the hospital and were reviewed by the residents and physician-instructor.

16. Joseph and Michael's very first clerkship rotation was in neurology.

**Neurology Course [July 2022 – August 2022]**

17. Joseph and Michael started the three-week neurology clerkship rotation in July 2022.

18. They were the only African American students in the neurology clerkship rotation.

19. From the beginning of their clerkship rotation, Joseph and Michael experienced actions that later led them to realize they were being singled out and treated differently from the non-minority students by the supervising residents.

20. The treatment by supervising MCASOM staff included, but is not limited to:

a.) Supervising residents testing Joseph and Michael's knowledge more rigorously than non-minority students on the same rotation;

b.) Supervising residents being inexplicably demeaning and hostile toward Joseph and Michael, who felt belittled, humiliated, and bullied by the conduct;

c.) Supervising residents requiring Joseph and Michael to report to the hospital an hour earlier than other students in the same rotation;

d.) Assigning Joseph and Michael two weeks of inpatient and one week of outpatient work (outpatient work is more beneficial in that it has more direct interaction with attending physicians and fewer hours) when non-minority students were assigned two weeks of outpatient and one week of inpatient work; and

e.) Attending physician throwing food at Joseph at an event in her office;

21. Other students in the rotation also noticed the different treatment directed at Joseph and Michael.

22. During the clerkship rotation neither Joseph nor Michael received feedback from the MCASOM staff about his performance in the rotation nor did either receive any alternative means to measure their performance.

23. The MCASOM Grading System Policy provides as follows:

> Medical students are assessed and provided with formal formative feedback at the midpoint, at least, of courses that are four weeks or longer in duration.
>
> For courses which are less than four weeks in length, an alternative means for medical students to measure progress in learning is provided.

24. The failure to provide Joseph and Michael with feedback or an alternative means to measure their performance violated the MCASOM Grading System Policy.

25. The MCASOM Grading System Policy also provides that clerkship grading may include a final examination, but that examination performance will not comprise more than 25% of the final grade.

26. In August 2022, Joseph and Michael learned that they had failed the neurology final examination.

27. By late August, both Joseph and Michael were participating in another clerkship rotation.

28. Their experience in their new clerkship was completely different than in the neurology clerkship.

29. They were not subjected to demeaning and hostile conduct and were treated the same as the other students.

30. Joseph and Michael never experienced the hostile conduct that they were subjected to in the neurology clerkship in any subsequent clerkship rotation.

31. On August 31, 2022, Joseph had a teleconference with the neurology Course Director, Dr. Jonathan Carter ("Dr. Carter") to discuss his examination grade.

32. During the teleconference, Joseph reported that he and Michael had been mistreated, harassed, and treated differently than the other students during the neurology course.

33. After a few minutes, Dr. Carter ended the teleconference without any indication that he would take any action on Joseph's report.

34. MCASOM defines harassment as:

> verbal or non-verbal, physical, or visual conduct that denigrates or shows hostility toward an individual because of that person's sex, race, age, religion, national origin, marital status, color, creed, sexual orientation, gender identity or expression, disability (physical and mental), veteran status, and status with regard to public assistance.

MCASOM Sexual and Other Harassment Policy.

35. The MCASOM Sexual and Other Harassment Policy further requires that all

> employees and students at Mayo Clinic have a responsibility to report immediately to the appropriate supervisor, administrator or designee any complaint of a lack of mutual respect or harassment which is brought to their attention. Employees and students are not required to determine whether suspected conduct constitutes harassment under this policy. They simply may report the suspected conduct….

36. The MCASOM Sexual and Other Harassment Policy additionally guarantees that:

> [a]ll allegations of harassment will be promptly and thoroughly investigated by the Human Resources service partner working collaboratively with a member of department leadership.

37. MCASOM has a Student Mistreatment Policy that provides for the following procedure in the case of student mistreatment:

> Reports of student mistreatment can be made to the Office of Student Affairs, school administrators, the school ombudsperson, faculty, advisors, and mentors or anonymously through the Mayo Clinic Integrity and Compliance Program Hotline/Portal….
>
> Any individual who receives a report of mistreatment should report the incident directly to the Dean of Student Affairs.

38. Furthermore, the MCASOM Grievance Procedure stipulates that:

> Individuals should first discuss any problems or complaints with the program director. The program director will respond in writing within thirty calendar days to answer questions or resolve complaints.

39. Dr. Carter violated MCASOM policy and did not forward Joseph's report of mistreatment and harassment to the Dean of Student Affairs, or to any other appropriate supervisor, administrator, or designee, nor did he respond in writing within thirty days regarding Joseph's complaints.

40. Instead, on September 1, 2022, both Joseph and Michael were formally notified that they had both failed the neurology course, clinically and academically.

41. Since their failure in the clinical portion of the neurology clerkship, Joseph and Michael have learned that at MCASOM, failure in a clinical portion of a clerkship is exceedingly rare and usually only if a student engages in egregious behavior or fails to attend.

42. Within a few weeks, Joseph and Michael were able to obtain all of the assessments from the neurology clerkship residents and attending physician together with the raw scores from the final examination.

43. Joseph met with the Associate Dean for Academic Affairs Keith Cannon ("Dr. Cannon") to discuss the failing grade.

44. Joseph reported the mistreatment, harassment and hostility he and Michael experienced from the neurology residents to Dr. Cannon.

45. D. Cannon recommended that Joseph and Michael appeal their neurology course grade.

46. Dr. Cannon reviewed the appeal documents prepared by Joseph and Michael prior to the September 26, 2022 deadline for submission to the Student Promotions and Assessment Review Committee ("SPARC").

47. Dr. Cannon also failed to forward Joseph's report of mistreatment as required by MCASOM's Sexual and Other Harassment Policy, Student Mistreatment Policy, and Grievance Procedure.

48. For the second time, MCASOM violated its own policies in failing to investigate Joseph's reports.

**Neurology Grading Errors**

49. Michael reviewed the clinical assessments and raw scoring from the examination and discovered factual errors and irregularities that violated MCASOM Grading System Policy, specifically the use of formative rather than summative feedback in grading.

50. Michael reviewed the scoring and realized that he had not failed his neurology final examination.

51. Michael confirmed his passing grade and scoring with MCASOM's Florida neurology clerkship director.

52. Michael found erroneous reports including:

- Michael was reported as unprofessional in an evaluation after a resident overheard him discussing a personal health issue with his attending physician;
- Michael was evaluated as inattentive for being unable to present a patient case following confusion when a resident told Michael to evaluate a patient, then a different resident told Michael the evaluation was redundant because the patient had already been assessed;
- The attending physician made a negative review of Joseph, falsely claiming that he was tardy for clinical duties, that he failed to alert clinical staff upon encountering a patient in clinical distress, and that he was unable to report a patient's medications.

53. Michael then discovered that Dr. Carter had improperly used email communications and formative feedback to grade Joseph and Michael, contrary to the MCASOM Grading System Policy, which mandates that grades are reported as "Summative assessments of medical student achievements."

54. The Course Level Comparability Policy, which provides guidance to instructors on how to grade, explicitly states that "formative assessments are designed to support students' learning but are not part of the final course grade."

55. The difference matters because formative feedback is meant to present a more varied picture of performance to be utilized only for improvement, while summative feedback is meant to give an overall impression of performance for grading purposes.

56. The MCASOM Grading System Policy additionally provides that:

> Students who do not meet all expectations of a course, which include but are not limited to a composite of clinical performance, professionalism, and medical knowledge, must complete a program of remediation within a specified period.
>
> Successful completion of this remediation will result in a grade of Pass with Remediation (see below regarding National Board of Medical Examiners (NBME) examinations).
>
> Students may be required to remediate courses due to concerns about clinical performance or professionalism, regardless of performance on NBME examination or the number of NBME examination attempts.
>
> Students who do not successfully meet all expectations following remediation will receive a grade of Fail.

57. Michael and Joseph later successfully remediated their neurology course.

58. Dr. Carter's grading violated the MCASOM Course Level Comparability Policy, MCASOM Grading System Policy, and the Liaison Committee on Medical

Education ("LCME") standards (which are cited and relied upon by MCASOM policies, thus incorporating them by reference into the contract between MCASOM and its students) including LCME Element 8.7 Comparability of Education/Assessment,[1] LCME Element 9.7 Formative Assessment and Feedback.[2]

59. On October 7, 2022, Michael had teleconference with Dr. Carter regarding his failing grade in the course.

60. Michael advised Dr. Carter that his grading methods violated MCASOM policies and deviated from LCME standards.

61. Dr. Carter minimized Michael's concerns and failed to provide a satisfactory explanation or remedy his deviation from the grading methodology.

**SPARC Appeal Consideration**

62. On October 19, 2022, SPARC considered the appeals filed by Joseph and Michael.

63. Being allotted only a few minutes to address SPARC, Joseph and Michael emphasized the following:

- The above referenced allegations related to their experiences during the neurology course and unfair treatment compared to non-minority peers;
- Violations of MCASOM policies in the grading process (including the lack of a syllabus, lack standardized grading criteria for the course, and lack of feedback);
- Concerns over bias, the potential for retaliation, and a request to retake the course at a different location, should the failing grade stand.

---

[1] "A medical school ensures that the medical curriculum includes comparable educational experiences and equivalent methods of assessment across all instructional sites within a given discipline."

[2] "A medical school ensures that medical students receive timely formative assessment and feedback in each course and clerkship (or, in Canada, clerkship rotation) in order to allow them to identify and correct their deficiencies."

64. Joseph and Michael were not permitted to be present for SPARC deliberations.

65. SPARC rejected Joseph's and Michael's appeals and also failed to refer their reports of mistreatment for investigation.

66. Despite the MCASOM Student Mistreatment and Faculty Misconduct Policy requiring investigation of any reported instance of student mistreatment, the concerns raised by Joseph and Michael were not formally investigated or even referred to any other body for investigation.

67. MCASOM's failure, on numerous occasions, to immediately investigate reports of mistreatment violated its own policies, prejudiced Joseph and Michael, and precipitated additional adverse consequences for their medical education, and ability to practice medicine.

**Disability Discrimination against Joseph and Michael [January 2023 – October 2023]**

68. Joseph and Michael have each been diagnosed with Attention-Deficit / Hyperactivity Disorder ("ADHD") and Generalized Anxiety Disorder / Panic Disorder.

69. The diagnosed conditions significantly limit major life activities including learning, concentration, and socialization, thus, necessitating specific accommodations to ensure equal access to educational opportunities as protected under Title III of the Americans with Disabilities Act ("ADA").

70. In January 2023, Michael requested that MCASOM Office of Wellness and Academic Support provide him with disability documentation needed to apply for a reasonable accommodation with the NBME for his USMLE examination.

71. MCASOM's written policy required students to take their USMLE examinations by December 1 of their fourth year.

72. However, on April 24, 2023, MCASOM arbitrarily changed the deadline, requiring its rising fourth year students to take the USMLE examination in August 2023.

73. MCASOM then failed to provide the disability documents to Michael until May 2023.

74. Upon receiving the documentation, Michael immediately applied for reasonable accommodation for his USMLE exam with the NBME.

75. NBME denied Michael's accommodation request.

76. The delay in receiving disability documentation from MCASOM prevented Michael from appealing the NBME's denial in time to accommodate MCASOM's arbitrary August exam schedule. Therefore, Michael was forced to take his USMLE exam without reasonable accommodations for his ADHD and Generalized Anxiety/Panic Disorder.

77. MCASOM's conduct violated its own Disability Accommodations Policy and Procedure, as well as the ADA.

78. In February 2023, Joseph requested an accommodation in the form of changing the location of his internal medicine clerkship from Arizona to Florida.

79. The request was made on the basis that Joseph's Anxiety Disorder / Panic Disorder would be exacerbated by working with a resident that had mistreated Joseph and given him negative reviews during his neurology course.

80. MCASOM denied Joseph's request for accommodation.

81. On April 4, 2023, Joseph contracted COVID, which exacerbated his ADHD and anxiety by placing additional stress on his body.

82. Joseph requested an accommodation to work virtually while he had COVID and while he was recovering and was told that a doctor's note would be required.

83. This requirement was impossible for Joseph to fulfill due to his clinical schedule and the operational hours of nearby medical facilities. Specifically, Joseph worked from 5:45AM to 6PM Monday through Friday.

84. MCASOM then denied his request for accommodation.

85. On April 4, 2023, Joseph had also requested an accommodation to take his OB/GYN clerkship in Phoenix rather than Tucson.

86. Joseph made the request because his Anxiety Disorder was exacerbated by post-COVID fatigue, and he wanted to be in Phoenix to avail himself of familial support.

87. Although non-minority and non-disabled students were permitted to complete their clerkship in Phoenix rather than Tucson, MCASOM denied Joseph's request for the accommodation.

88. In denying Joseph's request for a reasonable accommodation, MCASOM also threatened to extend Joseph's graduation by a year if he continued to request accommodations.

**MCASOM Administrative Reprisals**

89. On May 16, 2023, Joseph received a letter from SPARC alleging that he had "difficulty with clinical skills and medical knowledge" during surgery and family medicine

clerkships, including difficulty executing technical tasks (e.g., suture tying) and hesitancy noted during patient care.

90. The letter was false and misleading. In early 2023, Joseph passed the surgery clerkship and achieved a grade of "high pass" in the family medicine clerkship, scoring the second highest final exam score. Joseph also received Honors grades in the pediatrics and internal medicine clerkships.

91. Two days later, on May 18, 2023, Michael received a letter from SPARC, noting that he had been doing very well and thanking him for all his hard work.

92. On June 11, 2023, MCASOM advised Joseph and Michael that they had neglected numerous scheduling deadlines, which were imperative to their academic progression and administrative compliance.

93. Joseph and Michael met with MCASOM staff to discuss the issues.

94. In the meeting, MCASOM'S Senior Education Specialist Kristin Klarkowski ("Ms. Klarkowski") reprimanded Michael for arguing, and accused him of stealing hospital badges, engaging in rude communications with hospital employees, and failing to meet deadlines. Joseph was accused of failing to meet various deadlines and failing to properly schedule rotations.

95. The allegations against Joseph and Michael were false.

96. That meeting was less than a month after Michael received the letter from SPARC acknowledging his good and hard work.

97. When pressed, Ms. Klarkowski could not provide any specific details to support the accusations and allegations.

98. On June 29, 2023, Ms. Klarkowski imposed requirements for off-campus clinical rotations on Joseph and Michael that were not applied to any other students.

99. Joseph and Michael were specially required to prepare a proposal for their required off-campus electives, which would then have to be submitted to and approved by multiple levels of MCASOM bureaucracy before the elective could be scheduled, even though another student in their year had just been quickly approved for the exact same rotations.

100. These retaliatory actions against Joseph and Michael violated MCASOM's policies and procedures, which provide that "Mayo Clinic will not allow retaliation against or intimidation of a complainant", Student Mistreatment Policy; "Retaliation against individuals who bring forward complaints or assist in investigating complaints is prohibited," Grievance Procedure; and "Under no circumstances will retaliation or intimidation of a complainant be tolerated," Sexual and Other Harassment.

**MCASOM Imposes Permanent Probation**

101. On July 6, 2023, MCASOM advised Joseph that he was being placed on permanent probation.

102. MCASOM's letter placing Joseph on probation was replete with false accusations of missing scheduling deadlines, placing an extraordinary administrative burden on Academic Affairs staff, postponing examinations, delaying crucial meetings regarding the forgoing, and not following instructions regarding an OB/Gyn clerkship in Tucson.

103. On July 14, 2023, Joseph filed his intent to appeal the probation, pursuant to the Warning, Probation, Dismissal, and Appeal Policy, and notified MCASOM Dean of Education about race and disability discrimination that he had experienced in the neurology course and from staff after he challenged the neurology grade.

104. On July 21, 2023, MCASOM advised Michael that he was also being placed on permanent probation. MCASOM advised Michael that initially it decided to dismiss him from medical school but that the decision was reconsidered after discussion with the MCASOM legal team.

105. MCASOM's letter placing Michael on probation also contained false accusations. Michael was falsely accused of soliciting an employee to work with him in the future, missing scheduling deadlines, not completing modules on time or properly, providing false information regarding the forgoing to an affiliate employee, not following instructions for returning identifications badges to an affiliate, lack of professionalism throughout medical school, and unreported absences.

106. On July 28, 2023, Michael appealed the permanent probation under the Warning, Probation, Dismissal, and Appeal Policy.

107. Although Joseph and Michael both received allegations of missing scheduling deadlines related on their probation documents, Joseph and Michael had their schedule completely finalized by July 3, 2023. On July 27, 2023, at 7:37PM, a non-African American classmate messaged in the class GroupMe (a messaging system used to communicate with classmates): "Is anyone still having issues with scheduling clinical electives? so frustrated rn lol." This message received 7 likes from classmates, indicating

that numerous students had not finalized their schedules by July 27, 2023. Despite numerous other students not having finalized their rotations scheduled by this point in time, Joseph and Michael were the only students penalized for a non-existent infraction.

108. Days later, Joseph and Michael retained counsel to address the ongoing issues they were experiencing with MCASOM.

**MCASOM Alters Rotation Applications**

109. On July 23, 2023, Joseph and Michael's counsel notified MCASOM of their intent to file race and disability discrimination complaints with the Department of Education's Office of Civil Rights ("DOE-OCR").

110. On July 31, 2023, MCASOM informed Joseph and Michael that it would put the probation on pause to allow them to apply for off-campus-rotations, and that MCASOM would approve them during an internal investigation of issues they had raised.

111. Joseph and Michael requested the same rotations as a non-African American classmate and followed the same procedures as the classmate, submitting nearly identical requests through MCASOM's Workfront platform.

112. The non-African American classmate received approval of his rotation application within 24 hours.

113. MCASOM denied Joseph's and Michael's applications citing procedural missteps.

114. Joseph and Michael compared saved copies of their original Workfront submissions with the versions that were denied in Workfront and discovered that their submissions on Workfront had been altered.

115. Counsel for Joseph and Michael informed MCASOM that the applications had been altered on the MCASOM end and submitted a copy of the documents before and after alteration.

116. Four months later, MCASOM approved the rotations.

**MCASOM Disables Logging Function**

117. In August 2023, Joseph and Michael took the neurology clerkship for a second time. As part of the clerkship, Joseph and Michael were advised they could log their hours using MCASOM's MedHub software.

118. Joseph and Michael found the MedHub logging function was disabled for their accounts, so they kept track of their work hours separately.

119. On September 29, 2023, Joseph and Michael received an email from MCASOM stating that an audit found that they did not report their work hours and threatening to refer them for disciplinary action.

120. Joseph and Michael contacted MedHub, which confirmed that the feature for logging work hours in their accounts had been deactivated.

121. MedHub also confirmed that the deactivation of the logging function was not a system-wide error affecting others, but the logging function had been deactivated only for their accounts.

122. Medhub also confirmed that MCASOM personnel had sole discretion and ability to enable or disable the logging function.

123. Joseph and Michael reported the Medhub issue to MCASOM and submitted an email detailing all workdays and hours completed during the clerkship.

124. MCASOM did not investigate why the logging function had been disabled and also never pursued disciplinary action against Michael or Joseph.

**MCASOM Plan to Expel Joseph and Michael**

125. In early September 2023, Jospeh and Michael submitted formal complaints against MCASOM to the DOE-OCR.

126. Their complaints alleged MCASOM had discriminated against them on the basis of race and national origin in violation of Title VI, violated their rights under the ADA and Section 504 of the Rehabilitation Act, and had retaliated against them for their protected activity.

127. A few weeks later, Joseph and Michael learned that MCASOM Office of Student Affairs officials discussed a plan to expel Joseph and Michael after getting them to withdraw their DOE-OCR complaints and release all of their claims against MCASOM.

128. Joseph and Michael reported this incident to MCASOM Dean of Education on October 16, 2023.

129. Upon information and belief, MCASOM conducted no investigation into the misconduct reported by Joseph and Michael.

**Medical School Performance Evaluations for Joseph and Michael [September 2023]**

130. The fourth year of medical school has critical time periods to complete applications for post graduate residency programs.

131. Each student must obtain a Medical Student Performance Evaluation ("MSPE") letter, which is uploaded together with the student's application to the Electronic Residency Application Service ("ERAS").

132. All residency applications for all medical students in the United States go through the ERAS system.

133. It is therefore critical that a student's application and MSPE letter be uploaded by the medical school to the ERAS system prior to the deadline when residency programs download applications.

134. The MSPE, commonly referred to as the Dean's Letter, is crucial for residency applications as it provides residency programs with a comprehensive summary of a medical student's academic performance and professional attributes. This letter is a key component in the residency selection process, often heavily weighted by program directors to assess an applicant's suitability and readiness for residency training.

135. On September 8, 2023, Joseph sent an email to MCASOM regarding the Associate Dean of Student Affairs Dr. Amit Shah ("Dr. Shah").

136. Upon information and belief, Dr. Shah had been deeply involved in and contributed to MCASOM actions against Joseph and Michael.

137. Joseph's report served both as a misconduct complaint and a request to exclude Dr. Shah from any involvement in writing Joseph's and Michael's MSPE letters.

138. The request detailed an incident in July 2023 where Dr. Shah threatened minority medical students with disciplinary action, made an inappropriate joke towards a group of minority students, and thrust his finger in a female student's chest.

139. The ERAS deadline for all materials to be uploaded was September 27, 2023 at 9AM.

140. On September 26, 2023, Joseph and Michael discovered that MCASOM had removed and replaced documents from the transcript and MSPE sections of ERAS.

141. When asked, MCASOM described the newly uploaded documents as "placeholders." The placeholders were blank documents where the MSPE and transcripts should have been found and had been in Joseph's and Michael's ERAS files.

142. MCASOM provided copies of these placeholders as evidence of the pending corrections after Joseph and Michael requested copies of the materials.

143. The placeholders MCASOM provided to Joseph and Michael contained metadata identifying Dr. Shah as the creator and author.

144. In response to Joseph's and Michael's concerns, MCASOM promised corrections, including the removal of incorrect neurology entries and adjustments to the descriptive adjectives in the MSPEs.

145. Despite these assurances, as the ERAS application deadline approached, MCASOM failed to make the promised corrections.

146. Aware that inaccurate documents in the ERAS portal could have a significant negative impact on their residency applications and future careers, Joseph and Michael emailed the Executive Dean and Vice Dean of MCASOM to highlight the urgency of uploading corrected documents to the ERAS portal.

147. In response, MCASOM's counsel Kristine Zayko indicated that it would only correct the MSPEs and transcripts in exchange for a full release of claims or a settlement

proposal from Joseph and Michael, demonstrating the intentionality and knowledge of the harm the "placeholder" forms would cause.

148. MCASOM's untimely demand gave Joseph and Michael only hours to comply before the ERAS application system went live and applications were downloaded to residency programs.

149. Joseph and Michael did not have sufficient time to consult with counsel and develop a settlement proposal for MCASOM before the deadline.

150. MCASOM failed to upload corrected MSPEs for Joseph and Michael by the nationwide deadline.

151. An hour after the ERAS application deadline, MCASOM sent corrected documents to counsel for Joseph and Michael for approval.

152. MCASOM uploaded the corrected transcripts into the ERAS portal nearly three hours after the deadline for submission.

153. This delay in submitting accurate application materials harmed Joseph and Michael because higher-tier residency programs download residency applications at 9AM and do not accept late submissions.

154. More to the point, MCASOM's gamesmanship jeopardized Joseph's and Michael's opportunities to secure placements with preferred programs and adversely affected their future medical careers.

**MCASOM Impairs Ability to Obtain Mentor for Research Project**

155. On October 13, 2023, the Associate Director for Medical School Affairs emailed Joseph and Michael regarding their "longitudinal research enrichment," an essential requirement for graduation. This enrichment also required a research mentor.

156. In the email, the Associate Director also required Joseph and Michael to obtain a research mentor specifically from MCASOM's Arizona faculty.

157. This restriction was not imposed on Joseph or Michael prior to filing a formal DOE-OCR complaint and was not imposed on other MCASOM Arizona students who successfully selected mentors from other campuses.

158. Because of MCASOM's actions against Joseph and Michael and the Associate Dean speaking poorly to other faculty about Joseph and Michael, they found it nearly impossible to find Arizona MCASOM staff willing to serve as their research mentors.

**Complaints to DOE-OCR and Amendment of ERAS Entries**
**[September 2023 – February 2024]**

159. The MCASOM Vice Chair of Risk Management Amy Boyer ("Ms. Boyer") was tasked with investigating allegations identified by Joseph and Michael in their DOE-OCR complaint.

160. Ms. Boyer scheduled meetings with Joseph and Michael without consideration of their exam schedules, clinical duties, and preparation of ERAS applications.

161. Joseph and Michael advised Ms. Boyer of their availability and offered to respond in writing through their attorneys.

162. Ms. Boyer declined this offer and then inaccurately portrayed Joseph's and Michael's actions as uncooperative.

163. Ms. Boyer concluded her investigation on February 8, 2024 without input from Joseph or Michael or their counsel.

164. The investigation conducted by Ms. Boyer was incomplete and failed to address numerous allegations raised by Joseph and Michael.

165. Despite Joseph's and Michael's requests for Ms. Boyer to engage with their counsel in order to review the extensive evidence available, Ms. Boyer's findings stated that there was no support for allegations of discrimination, harassment, or retaliation under MCASOM policies.

166. However, Ms. Boyer did find that MCASOM failed to follow its own policies and should have immediately initiated an investigation into issues Joseph and Michael brought forward at the October 2022 SPARC meeting.

167. On February 9, 2024, Joseph and Michael emailed expressing their disappointment with Ms. Boyer's investigation, one "devoid of substance and legitimacy," and advising MCASOM of their intent to file an additional complaint with the DOE-OCR.

168. Joseph and Michael explicitly requested that MCASOM take no further action against them until DOE-OCR completed its own investigation of their complaints against MCASOM.

169. MCASOM informed Joseph and Michael that Ms. Boyer's findings were final, and that their MSPE letters and transcripts in ERAS would be amended to reflect that

they had failed the neurology course, rather than including only the later neurology course, in which both Joseph and Michael both excelled.

170. On February 9, 2024, Joseph and Michael filed a second DOE-OCR complaint detailing retaliatory actions taken by MCASOM after the submission of their first DOE-OCR complaints on September 12, 2023.

171. On February 11, 2024, Joseph and Michael raised the issue of the decision to amend their ERAS entries on the grounds that the decision constituted discrimination and retaliation, and that the underlying issues were under review by the DOE-OCR.

172. Joseph and Michael explained that changes to amend the ERAS entries would lead to irreparable damage to their future careers.

173. On February 12, 2024, MCASOM denied the appeal on the grounds that addendums are not appealable. MCASOM then amended the ERAS entries and uploaded them.

**MCASOM Amends Its Policies to Enable Retaliation**

174. Prior to October 31, 2023, the MCASOM MSPE policy permitted addendums to ERAS entries after being uploaded on September 27, 2023 only to include relevant fourth-year coursework.

175. On October 31, 2023, MCASOM amended its MSPE policy to require its officials to addend ERAS entries to add course failures and professionalism violations that occurred after the September 27, 2023 deadline.

176. Upon information and belief, MCASOM's MSPE October 31, 2023 policy amendments were specifically designed to enable MCASOM to retaliate against Joseph and Michael.

177. Amendment of the ERAS entries for Joseph and Michael coincided with the residency match process, more fully described below.

**Formal Non-Academic Warning**
**[February 2024-March 2024]**

178. On February 26, 2024, MCASOM issued letters downgrading Joseph and Michael from Permanent Probation to Formal Non-Academic Warning due to the successful remediation of their neurology coursework.

179. MCASOM's Warning, Probation, Dismissal and Appeal Procedure does not authorize a "downgrading" to Formal Non-Academic Warning.

180. Rather, under the MCASOM Warning, Probation, Dismissal and Appeal Procedure, MCASOM had the option of removing or extending the probationary status or dismissing Joseph and Michael.

181. Because Joseph and Michael had met all the "remediation" requirements of their "Permanent Probation" letter, the only appropriate action would have been to remove their probationary status.

182. MCASOM's action in "downgrading" Permanent Probation to Formal Non-Academic Warning violated MCASOM's Warning, Probation, Dismissal and Appeal Procedure.

183. MCASOM had no legitimate basis for imposing a Formal Non-Academic Warning on Joseph and Michael and did not cite one in the "downgrading" letter. The Formal Warning also failed to list specific deficiencies, refer to prior discussions, create a remedial plan, or define expectations and provide a time frame, as is required by the Warning, Probation, Dismissal, and Appeals Policy.

184. Via email on March 4, 2024, Joseph and Michael replied to MCASOM detailing that the failure to identify a clear description of deficiencies, documentation of problems, a remedial plan, and/or clear expectations and timeframes for compliance violated MCASOM's Warning, Probation, Dismissal and Appeal Policy and Procedure.

185. Joseph and Michael explained to MCASOM that its punitive and discriminatory discipline violated federal laws.

186. Joseph and Michael requested specific actions to correct the issues with the letter and asked for an outline of the due process steps available to students facing false allegations and egregious errors in warning letters.

187. On March 6, 2024, MCASOM responded by claiming that there was no need for specificity in the letter and no option for appeal. MCASOM advised that the Warnings would remain until graduation.

188. On April 5, 2024, Michale and Joseph reiterated objections to the February 26, 2024 SPARC warning and highlighted retaliation including retaliation following DOE-OCR complaints, violation of federal laws and MCASOM policy, and continued disparate treatment. They demanded an external investigation, removal of disciplinary actions, and a formal apology. MCASOM did not respond to Plaintiffs' demand.

189. MCASOM violated and abused its disciplinary policies to harass and otherwise harm Joseph and Michael.

**Joseph and Michael Are Not Matched with a Residency Program**
**[March 2024]**

190. Residency match is a highly competitive job placement process where medical graduates are matched with residency programs based on mutual preference rankings.

191. Information uploaded to ERAS in September is considered by residency programs, which then interview potential candidates before matches are announced the following March.

192. Applicants that are not matched to a residency program have four days following the residency match announcements to attempt to match to an unfilled program.

193. Just before residency programs finalized their match-lists to select job applicants in March 2024, Joseph's and Michael's ERAS entries were adversely amended, and they received Formal Non-Academic Warnings from MCASOM.

194. Joseph and Michael each were each ranked 14 times in residency programs, each having 10 to 12 interviews, which historically, virtually guarantees a match.

195. Joseph and Michael were notified that they were not matched to residency programs and were subsequently unable to secure psychiatry residencies in the four days following the announcement of matches.

196. The failure to match is directly attributable to MCASOM's actions, including delaying the upload of Joseph's and Michael's MSPE and transcripts, modifying Joseph's and Michael's MSPE letters to reflect a poor assessment and a failing grade in Neurology,

and inappropriately placing them on Permanent Probation and then Non-Academic Warning status.

197. MCASOM effectively destroyed Jospeh's and Michael's dreams of working as physicians.

**MCASOM Violates Confidentiality**

198. MCASOM assured students on March 1, 2024 that a no-match outcome for any student would remain confidential.

199. Historically, at least for the past 15 years, MCASOM adhered to a practice of non-disclosure regarding "no match" results among medical students.

200. After Joseph and Michael were not matched to a residency program, MCASOM publicized an internal confidential document that listed Joseph and Michael as the only students receiving no match.

201. MCASOM sent the document identifying Joseph and Michael as not having matched via email to all medical students and educational staff. The document also contained numerous identifiers related to the students including their full names, AAMC IDs, NRMP IDs, USMLE IDs, and "NO MATCH" results.

202. MCASOM's Student Records and the Family Educational Rights and Privacy Act ("FERPA") Policy prohibits disclosure of student education records, like one's match results, to an unauthorized third party, including other students at the medical school.

203. Upon information and belief, MCASOM's release of Joseph and Michael no-match status was intended to cause, and did cause, embarrassment, distress, and humiliation to Joseph and Michael.

204. The upshot of MCASOM's conduct is that Joseph and Michael may never be able to practice medicine. A senior MCASOM official advised Joseph and Michael that it would be futile to re-apply for residencies. In the official's estimation there is no way to satisfactorily explain the gap or their failure to match into a residency program.

205. As a result of MCASOM's conduct, Joseph and Michael have been damaged.

206. MCASCOM, as alleged above, engaged in conduct that was outrageous, oppressive or intolerable, and created a substantial risk of tremendous harm, thereby evidencing a conscious and deliberate disregard of the interests and rights of Joseph and Michael.

207. As such, Joseph and Michael are entitled to an award of punitive damages in an amount sufficient to deter Defendant from such conduct in the future.

**COUNT ONE**
**TITLE VI**
**Intentional Discrimination/Hostile Environment**

208. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

209. Title VI of the Civil Rights Act, 42 U.S.C. § 2000d *et seq*., provides:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.

210. Defendant MCASOM is a recipient of federal financial assistance.

211. As a recipient of federal financial assistance and consistent with Title VI, MCASOM may not take action motivated by race, color or national origin discrimination,

including excluding individuals, denying benefits of subjecting individuals to segregation or separate treatment.

212. Plaintiffs, as African Americans of Egyptian and Ethiopian national origin, are members of legally recognized protected classes.

213. Upon information and belief, Defendant intentionally discriminated against Plaintiffs based upon their race and national origin.

214. Similarly situated non-African Americans were not subjected to same actions by Defendant, including, but not limited to, mistreatment during their neurology coursework and delays in approval or denials of requests granted to non-minority students.

215. Defendant has no legitimate non-discriminatory reason or basis for its actions against plaintiffs.

216. Defendant's racial harassment created a racially hostile environment in that it was sufficiently severe that would interfere with the educational program of a reasonable person of the same age and race as Plaintiffs.

217. Defendant, at multiple points, had notice of the problem and failed to adequately redress the racially hostile environment.

218. Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiffs' academic and career prospects, earning potential, and reputation have been severely harmed, and they have suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**COUNT TWO**
**TITLE VI**
**RETALIATION**

219. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

220. Title VI of the Civil Rights Act forbids retaliation against individuals engaging in protected activity including reporting violations of law. *See* 34 C.F.R. § 100.7(e).

221. Plaintiffs' protected activities under Title VI include:

a. Plaintiffs reported incidents of differential treatment and perceived discrimination after their initial neurology rotations;

b. Plaintiffs appealed academic evaluations and grades, particularly disputing the failing grades received in the neurology clerkship, arguing that these were unjustly assigned in a manner that was discriminatory;

c. Plaintiffs raised race discrimination issues in MCASOM's internal grievance procedures by meeting with the Dean of Academic Affairs, discussing their concerns to SPARC and discussing their concerns with MCASOM administrators;

d. Plaintiffs reported their concerns related to discrimination, harassment, and the need for a fair and unbiased evaluation process directly to MCASOM's administration in emails and in meetings to review and discuss their grievances;

e. After experiencing mistreatment, Plaintiffs requested investigations into Student Mistreatment Workgroup failure to act and the acknowledgment of a failure in the investigatory duty by MCASOM;

f. Plaintiffs notified MCASOM of their intent to file complaints with external entities, such as the DOE-OCR, indicating their intent to pursue external remedies in light of ongoing concerns about discrimination, harassment, and retaliation; and,

g. Plaintiffs filed formal complaints with the DOE-OCR, outlining their grievances and alleging race discrimination, further

engaging in protected activities by seeking external intervention in their dispute with MCASOM.

222. Shortly after their protected activities, Plaintiffs were subjected to a series of adverse actions, including but not limited to:

a. Unwarranted academic probation and warnings containing false or misleading allegations;

b. Systematic exclusion from academic and professional opportunities;

c. Public humiliation and defamation within the academic and professional community;

d. The implementation of disproportionate disciplinary measures compared to similarly situated students who did not engage in protected activities;

e. Defendant engaged in the unauthorized alteration of Plaintiffs' academic records, including the improper insertion of plaintiff's fail grade and the removal of positive remarks, which unjustly impacted Plaintiffs' academic standing and future career opportunities;

f. Defendant withheld essential academic support and resources, including, access to mentoring opportunities, clinical rotation opportunities, and participation in research projects, which are critical for the completion of medical education and professional development;

g. Defendant applied policies and procedures in a restrictive and arbitrary manner uniquely against Plaintiffs, such as imposing unnecessary bureaucratic hurdles, enforcing non-existent policies, and applying standards unequally;

h. Defendant initiated disciplinary actions against Plaintiffs based on fabricated or exaggerated allegations, often invoking harsh penalties for minor or non-existent infractions, in stark contrast to the treatment of other students not engaged in protected activities;

i. Defendant denied Plaintiffs the right to due process by refusing to allow them an opportunity to contest allegations, failing to provide clear and timely information about the grounds for adverse actions, and obstructing Plaintiffs' access to grievance procedures;

j. Defendant encouraged or allowed other individuals, including faculty members, administrators, and fellow students, to engage in retaliatory behavior against Plaintiffs, effectively outsourcing retaliation to maintain an appearance of neutrality; and

k. Defendant misused confidential information pertaining to Plaintiffs, as a basis for adverse actions, violating Plaintiffs' privacy and further undermining their academic and professional standing.

223. Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiffs' academic and career prospects, earning potential, and reputation have been severely harmed and they have suffered loss of educational and professional opportunities, loss of future career prospects and other pecuniary and non-pecuniary harm.

**COUNT THREE**
**BREACH OF CONTRACT**

224. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

225. Plaintiffs paid MCASOM sums of money for their education, and in return, MCASOM contracted to provide Plaintiffs with access to its medical degree program.

226. The relationship between the parties is contractual in nature, and each party owes the other certain duties, some of which can be found in MCASOM's written policies, acceptance letters, enrollment documents and student handbooks.

227. MCASOM's contract with Plaintiffs includes expressly and implicitly promises of an educational environment predicated on equal treatment, confidentiality, due process,

accommodation for disabilities, fair grading, professional advancement support, diligent complaint investigation, respect for student dignity, and adherence to institutional and educational standards including those set forth by accrediting bodies such as LCME.

228. As alleged herein, MCASOM violated its contract with Plaintiffs in multiple ways including, but not limited to:

a. Breach of its contractual obligation under its Student Records and Family Educational Rights and Privacy Act (FERPA) Policy to maintain the confidentiality of student information by the unauthorized disclosure and misuse of Joseph's and Michael's no-match status;

b. Breach of Protection from Retaliation: MCASOM violated its contractual obligation under its Student Mistreatment Policy and Grievance Procedure to protect students from retaliation following the exercise of their rights. Plaintiffs faced punitive measures, including probation and academic threats, after engaging in protected activities such as filing grievances related to racial discrimination and requesting ADA accommodations.

c. Breach of Disability Accommodations Policy and Procedure: MCASOM's consistent denial and delay in providing reasonable accommodations for the documented disabilities of Joseph and Michael contravene its ADA obligations and contractual commitments;

d. Breach of Fair and Transparent Grading Practices: By deviating from established grading policies without clear criteria, as admitted by Dr. Carter, MCASOM failed to uphold its contractual obligation for fair and transparent grading under its Grading System Policy. Specifically, in violation of its Grading System Policy, MCASOM (1) breached its obligation to assess Joseph's and Michael's neurology grade through summative feedback rather than formative feedback; (2) breached its obligation to provide feedback or an alternative means to measure progress during Joseph's and Michael's neurology course; and (3) breached its agreement to change Joseph's and Michael's neurology grade to Pass after successful remediation;

e. Breach of Support for Academic and Professional Advancement: The denial of clinical rotation opportunities and the improper alteration of academic records, hindering the plaintiffs' residency applications, constitute

a breach of MCASOM's duty to support the plaintiffs' academic and professional progression;

f. Breach of Investigation of Complaints: The institution's failure to initiate a formal investigation into the plaintiffs' complaints of mistreatment and discrimination breaches its contractual obligation under its Student Mistreatment Policy and Grievance Procedure to report allegations of discrimination and/or harassment to the appropriate party and to conduct transparent and fair investigations;

g. Breach of Warning, Probation, and Dismissal Policy and Procedure: MCASOM breached this policy by "downgrading" Plaintiffs' probation to a formal non-academic warning, even though that was not an option under the policy, and by failing to meet the standards for the required information in a formal warning when issued;

h. Breach of Respect for Students' Rights and Dignity: Actions that led to the public humiliation and dissemination of false allegations against the plaintiffs, breach MCASOM's obligation to treat students with respect and dignity under its Mutual Respect Policy.

229. As a direct and proximate result of that breach, Plaintiffs suffered the harms described above and are entitled to all available legal and equitable remedies.

**COUNT FOUR**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

230. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

231. Every contract contains within it an implied covenant of good faith and fair dealing.

232. By the facts alleged herein, MCASOM breached that covenant by exceeding the limits of reasonableness as alleged above, thereby exercising its contractually vested discretion in a manner that thwarted Plaintiffs' reasonable expectations as to the essence of the contract.

233. Specifically, MCASOM thwarted Plaintiffs' reasonable expectations of the contract by, among other things: (1) disclosing their private student information; (2) amending their MSPE Policy in order to add negative addenda to Plaintiffs' ERAS applications; (3) taking disciplinary actions out of line with their Warning, Probation, and Dismissal Policy; and (4) retaliating against Plaintiffs.

234. As a direct and proximate result of that breach, Plaintiffs suffered the harms described above.

**COUNT FIVE**
**42 U.S.C. § 1981**
**EQUAL RIGHTS UNDER THE LAW – RACIAL DISCRIMINATION**

235. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

236. 42 U.S.C. § 1981 in relevant part requires that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

237. 42 U.S.C. § 1981 protects the African American student's "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" pursuant to MCASOM's policies which establish the parties' contractual rights.

238. MCASOM's policies represent a contractual commitment to Plaintiffs.

239. As African American students, Plaintiffs are members of a protected class.

240. Plaintiffs are qualified to attend MCASOM as medical students.

241. Plaintiffs suffered adverse actions in that Defendant deprived them of their various contractual rights pursuant to MCASOM's policies set out herein (specifically in paragraph 228) because of their race. Plaintiffs' injuries would not have occurred but for Defendant's unlawful conduct.

242. Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiffs' academic and career prospects, earning potential, and reputation have been severely harmed, and they have suffered loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

243. Defendant has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of Plaintiffs.

244. Thus, Plaintiffs are entitled to all legal and equitable remedies available, including all applicable damages, prejudgment interest, attorneys' fees pursuant 42 U.S.C. § 1988 and on any other applicable basis, costs, and other compensation in an amount to be determined upon the trial of this action.

**COUNT SIX**
**42 U.S.C. § 1981**
**RETALIATION**

245. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

246. 42 U.S.C. § 1981 forbids retaliation against individuals engaging in protected activity including reporting violations of law. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008).

247. Plaintiffs' protected activities include but are not limited to:

a. Plaintiffs reported incidents of differential treatment and perceived discrimination after their initial neurology rotations;

b. Plaintiffs appealed academic evaluations and grades, particularly disputing the failing grades received in the neurology clerkship, arguing that these were unjustly assigned in a manner that was discriminatory;

c. Plaintiffs raised race discrimination issues in MCASOM's internal grievance procedures by meeting with the Dean of Student Affairs, drafting and submitting appeal letters to SPARC and discussing their concerns with MCASOM administrators;

d. Plaintiffs reported their concerns related to discrimination, harassment, and the need for a fair and unbiased evaluation process directly to MCASOM's administration in emails and in meetings to review and discuss their grievances;

e. After experiencing mistreatment, Plaintiffs requested investigations into Student Mistreatment Workgroup failure to act and the acknowledgment of a failure in the investigatory duty by MCASOM;

f. Plaintiffs notified MCASOM of their intent to file complaints with external entities, such as the Department of Education's Office of Civil Rights (DOE-OCR), indicating their intent to pursue external remedies in light of ongoing concerns about discrimination, harassment, and retaliation; and,

g. Plaintiffs filed formal complaints with the DOE-OCR, outlining their grievances and alleging race discrimination, further engaging in protected activities by seeking external intervention in their dispute with MCASOM.

248. Shortly after their protected activities, Plaintiffs were subjected to a series of adverse actions, including but not limited to:

a. Unwarranted academic probation and warnings containing false or misleading allegations;

b. Systematic exclusion from academic and professional opportunities;

c. Public humiliation and defamation within the academic and professional community;

d. The implementation of disproportionate disciplinary measures compared to similarly situated students who did not engage in protected activities;

e. Defendant engaged in the unauthorized alteration of Plaintiffs' academic records, including the improper insertion of plaintiff's fail grade and the removal of positive remarks, which unjustly impacted Plaintiffs' academic standing and future career opportunities;

f. Defendant withheld essential academic support and resources, including access to tutoring services, clinical rotation opportunities, and participation in research projects, which are critical for the completion of medical education and professional development;

g. Defendant applied policies and procedures in a restrictive and arbitrary manner uniquely against Plaintiffs, such as imposing unnecessary bureaucratic hurdles, enforcing non-existent policies, and applying standards unequally;

h. Defendant initiated disciplinary actions against Plaintiffs based on fabricated or exaggerated allegations, often invoking harsh penalties for minor or non-existent infractions, in stark contrast to the treatment of other students not engaged in protected activities;

i. Defendant denied Plaintiffs the right to due process by refusing to allow them an opportunity to contest allegations, failing to provide clear and timely information about the grounds for adverse actions, and obstructing Plaintiffs' access to grievance procedures;

j. Defendant encouraged or allowed other individuals, including faculty members, administrators, and fellow students, to engage in retaliatory behavior against Plaintiffs, effectively outsourcing retaliation to maintain an appearance of neutrality; and

k. Defendant misused confidential information pertaining to Plaintiffs, as a basis for adverse actions, violating Plaintiffs' privacy and further undermining their academic and professional standing.

249. Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiffs' academic and career prospects, earning potential, and reputation have been severely harmed and they have suffered loss of educational and professional opportunities, loss of future career prospects and other pecuniary and non-pecuniary harm.

250. Defendant acted, as alleged herein, intentionally and has done so with malice or with reckless indifference to the federally protected rights of Plaintiffs entitling them to an award of punitive damages.

**COUNT SEVEN**
**DEFAMATION**

251. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

252. Upon information and belief, MCASOM's SPARC chair and the two vice chairs made false and defamatory statements about Plaintiffs and published them to 21 MCASOM physicians sitting on the SPARC committee.

253. In Arizona, statements made in communication between two agents of the same principal is publication for the purposes of defamation, subject to qualified privilege.

254. Defendant has abused any qualified privilege they may have by acting with actual malice.

255. Upon information and belief, MCASOM's SPARC chair and two vice chairs knew the statements were false, acted in reckless disregard of whether the statements were true or false, or negligently failed to ascertain the truth or falsity of the statements.

256. The false statements about Joseph are contained in MCASOM's July 6, 2023 letter placing Joseph on probation that was signed by MCASCOM's SPARC chair and two vice chairs. The false statements are that Joseph missed deadlines, placed an extraordinary administrative burden on Academic Affairs staff, postponed examinations, delayed crucial meetings regarding the forgoing, and did not follow instructions regarding an OB/Gyn clerkship in Tucson.

257. The false statements about Michael are contained in MCASOM's July 6, 2023 letter placing Michael on probation that was signed by MCASCOM's SPARC chair and two vice chairs.

258. The false statements are that solicited an employee to work with him in the future, missed deadlines, did not completing modules on time or properly, provided false information regarding the forgoing to an affiliate employee, did not follow instructions for returning identifications badges to an affiliate, lacked professionalism throughout medical school, and had unreported absences.

259. Those statements are the kind likely to cause harm to Plaintiffs' reputation.

260. As a result of MCASOM's conduct, Plaintiffs have suffered reputational harm and have been otherwise damaged.

261. MCASOM acted with actual malice and/or intended to cause harm, or was motivated by spite or ill will, or its conduct was outrageous, oppressive, or intolerable, and MCASOM knew or intentionally disregarded that its conduct created a substantial risk of significant harm to Plaintiffs. Plaintiffs are therefore entitled to an award of punitive damages.

**COUNT EIGHT**
**NEGLIGENCE/NEGLICENCE PER SE**

262. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

263. MCASOM owed Plaintiffs a duty to maintain the confidentiality of their educational records, including residency matching results.

264. The obligation to maintain confidentiality of Plaintiffs' educational records is also imposed on MCASOM by federal statute, the Family Educational Rights and Privacy Act ("FERPA").

265. MCASOM breached its duty to maintain the confidentiality of Plaintiffs' records by circulating an email to at least 200 individuals with Plaintiffs' personal identifying information including the fact that Plaintiffs had not matched for a residency program.

266. Upon information and belief, MCASOM also violated FERPA by sending the email with Plaintiffs' personal identifying information without permission.

267. MCASOM's violation of FERPA constitutes negligence *per se.*

268. MCASOM's conduct was the proximate cause and cause in fact of Plaintiffs' harm.

269. Both Plaintiffs were humiliated and suffered emotional distress from MCASOM's circulation of their confidential information including the fact that they had not matched with a residency program.

## COUNT NINE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT (ADA)

270. Plaintiffs reallege all prior allegations as if fully set forth herein.

271. Plaintiffs have each been diagnosed with ADHD and Generalized Anxiety Disorder/Panic Disorder, conditions that significantly limit their major life activities including learning, concentration, and socialization. These conditions necessitate specific accommodations to ensure equal access to educational opportunities, as protected under the ADA.

272. The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA") prohibits private schools from discriminating on the basis of disability and requires private schools to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(ii); *see also* 42 U.S.C. § 12181(7)(J) (defining "public accommodation" to include private schools).

273. The accommodation requests made by Joseph, such as changes to clinical rotation locations to avoid exacerbation of anxiety disorders, virtual rotation options during illness, and requests for documentation for Michael's USMLE Step II were directly related to mitigating the limitations imposed by their disabilities.

274. The requests for accommodation were reasonable and did not impose an undue burden.

275. MCASOM has significant resources and a precedent for accommodating diverse student needs, reflecting that accommodating the Plaintiffs' reasonable requests would not impose undue hardship.

276. The undue delay and denial of accommodations, especially when such accommodations had been previously granted to others, does not reflect a lack of capability or resources but rather a discriminatory reluctance to assist Plaintiffs.

277. Plaintiffs made repeated, documented requests for accommodations, such as requests for documents, which were either unreasonably delayed, denied, or inadequately addressed.

278. Plaintiffs experienced and documented instances of differential treatment and hostile acts, including, but not limited to, being subject to unjustified academic evaluations, and alterations to their educational records without justification, indicative of a broader pattern of discrimination based on their disabilities and requests for accommodations.

279. Plaintiffs' requests for accommodations were reasonable and consistent with ADA requirements, providing such accommodations would not have constituted an undue hardship for MCASOM, and the patterns of behavior they experienced and documented constitute clear evidence of discrimination.

280. As a result, Plaintiffs have been harmed.

281. MCASOM engaged in discriminatory conduct, as alleged herein, with malice or with reckless indifference to the federally protected rights of Plaintiffs. Plaintiffs are entitled to an award of punitive damages.

## COUNT TEN
## RETALIATION IN VIOLATION OF THE ADA

282. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

283. The ADA forbids retaliation against individuals engaging in protected activity including reporting violations of law. *See* 42 U.S.C. § 12203(a).

284. Plaintiffs' protected activities under the ADA include but are not limited to:

a. Plaintiffs raised issues regarding MCASOM's failure to provide certain disability accommodations in violation of the ADA using MCASOM's internal grievance procedures by meeting with the Dean of Student Affairs, drafting and submitting appeal letters to SPARC and discussing their concerns with MCASOM administrators;

b. Plaintiffs notified MCASOM of their intent to file complaints with external entities, such as the Department of Education's Office of Civil Rights (DOE-OCR), indicating their intent to pursue external remedies in light of ongoing concerns about discrimination, harassment, and retaliation in violation of the ADA; and,

c. Plaintiffs filed formal complaints with the DOE-OCR, outlining their grievances and alleging disability discrimination, further engaging in protected activities by seeking external intervention in their dispute with MCASOM.

285. Shortly after their protected activities, Plaintiffs were subjected to a series of adverse actions, including but not limited to:

a. Unwarranted warnings which were issued in an inconsistent and unfair manner;

b. Systematic exclusion from academic and professional opportunities;

c. Public humiliation and defamation within the academic and professional community;

d. The implementation of disproportionate disciplinary measures compared to similarly situated students who did not engage in protected activities;

e. Defendant engaged in the unauthorized alteration of Plaintiffs' academic records, including the improper insertion of plaintiff's fail grade and the removal of positive remarks, which unjustly impacted Plaintiffs' academic standing and future career opportunities;

f. Defendant withheld essential academic support and resources, including clinical rotation opportunities, and participation in research projects, which are critical for the completion of medical education and professional development;

g. Defendant applied policies and procedures in a restrictive and arbitrary manner uniquely against Plaintiffs, such as imposing unnecessary bureaucratic hurdles, enforcing non-existent policies, and applying standards unequally;

h. Defendant denied Plaintiffs the right to due process by refusing to allow them an opportunity to contest allegations, failing to provide clear and timely information about the grounds for adverse actions, and obstructing Plaintiffs' access to grievance procedures;

i. Defendant encouraged or allowed other individuals, including faculty members and administrators, to engage in retaliatory behavior against Plaintiffs, effectively outsourcing retaliation to maintain an appearance of neutrality; and

j. Defendant misused confidential information pertaining to Plaintiffs, as a basis for adverse actions, violating Plaintiffs' privacy and further undermining their academic and professional standing.

286. Based upon the forgoing, as a direct and proximate result of the Defendant's conduct as alleged above, Plaintiffs' academic and career prospects, earning potential, and reputation have been severely harmed and they have suffered loss of educational and

professional opportunities, loss of future career prospects and other pecuniary and non-pecuniary harm.

287. MCASOM engaged in retaliatory conduct, as alleged herein, with malice or with reckless indifference to the federally protected rights of Plaintiffs. Plaintiffs are entitled to an award of punitive damages.

**COUNT ELEVEN**
**VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT**

288. Plaintiffs incorporate all prior paragraphs as if fully set forth herein.

289. Section 504 of the Rehabilitation Act of 1973 prohibits any program or activity receiving federal financial assistance from discriminating against a qualified individual with a disability. 29 U.S.C. § 794(a).

290. In the ways and for the reasons set forth in Count Nine above, Defendant discriminated against Plaintiffs and failed to provide reasonable accommodations in violation of Section 504 of the Rehabilitation Act.

291. As a result, Plaintiffs have suffered harm.

**JURY DEMAND**

292. Plaintiffs demand a trial by jury.

**WHEREFORE**, the Plaintiffs request that this Court enter judgment against defendant as follows:

a. Ruling in favor of Plaintiffs;

b. Declaring that Defendant's conduct violated: (a) Title VI of the Civil Rights Act of 1964, (b) 42 U.S.C. § 1981, and (c) the parties' contracts;

c. Entering Injunctive relief to include correcting Plaintiffs' academic records and MSPE letters to prevent further harm;

d. Awarding Plaintiffs compensatory damages in an amount to be proven at trial;

e. Awarding Plaintiffs punitive damages under State and Federal law, as applicable, in an amount sufficient to deter Defendant from such conduct in the future;

f. Awarding Plaintiffs their attorney's fees and costs pursuant to 42 U.S.C. § 1988 and/or under any other applicable provision; and

g. Granting such other and further relief as is just and proper.

Dated this 12th day of May, 2025.

BIHN & McDANIEL, P.L.C.

/s/ Martin A. Bihn

____________________

Martin A. Bihn
*Co-Counsel for Plaintiffs*

TAYLOR & GOMEZ, LLP

/s/ Benjamin Taylor

____________________

Benjamin Taylor
*Co-Counsel for Plaintiffs*

LAW OFFICE OF MICHAEL S. ESKANDER, P.L.C.

/s/ Michael S. Eskander

____________________________

Michael S. Eskander
*Co-Counsel for Plaintiffs*